FA'ATILIGA TAPUVAE, MAFA TUIKA, TU'UTAU P. FANENE,
TIA PENITUSI, ERIC HOWLAND, LOUISULU LE'I,
POPOALI'I UOTI, FAIVALE GA'OPO'A, ROBERT KEY,
PASELIO LEATISUA, and NOFO VAILAAU, for
themselves, for the AMERICAN SAMOA DEVELOPMENT
CORPORATION (ASDC), and for shareholders of ASDC
similarly situated, Plaintiffs,

v.

A.P. LUTALI as individual, as former Director and
President of ASDC, and as Governor of American
Samoa, ENI HUNKIN as individual and as Lieutenant
Governor of American Samoa, STEVE WATSON as
individual and as Executive Assistant to the
Governor, J.R. SCANLAN as individual, as Assistant
to the Governor and as Director of ASDC,
LEULUMOEGA S. LUTU as individual and as Attorney
General of American Samoa, JOHN SANIA as
individual and as Chairman of the Board of
Directors of ASDC, FAAUUGA ACHICA as individual
and as Secretary of ASDC, VERA ANNESLEY as
individual and as Director of ASDC, FAIIVAE
A. GALEA'I as individual and as Director of
ASDC, TUIAFONO MATAUTIA as individual and as
Director of ASDC, SILI K. SATAUA as individual
and as Director of ASDC, AIGA TASI, Inc., LI'A
AFUVAI as an officer of Aiga Tasi Inc., and
DEVELOPMENT BANK OF AMERICAN SAMOA, Defendants

High Court of American Samoa
Trial Division

CA. NO. 103-86

December 24, 1986

139

Before REES, Chief Justice, AFUOLA, Associate Judge, and VAIVAO, Associate Judge.

Counsel: For the Plaintiffs, Aviata Fa'alevao
For Defendants ASG et al., Phyllis Coven, Assistant Attorney General, and Moega Lutu, Attorney General
For Defendant Aiga Tasi, Steven Lee and Hartwell Blake, Honolulu, Hawaii, pro hac vice

This case arose out of an effort by the territorial government (A.S.G.) to "privatize" the ownership of the only hotel in American Samoa.

Early in 1985 A.S.G. made a public announcement that it would offer for sale 87,796 shares in the American Samoa Development Corporation (ASDC), the corporation that owns the Rainmaker Hotel. These shares comprise a large majority of the shares in ASDC. They are held in the name of the Development bank of American Samoa, an enterprise established by territorial statute and wholly owned by A.S.G. See A.S.C.A. § 28.0101 et seq. Two bids were submitted, and in October

1985 A.S.G. entered into a one-year option contract with Aiga Tasi, Inc., a Texas corporation. According to the option contract Aiga Tasi had the right to purchase the shares for $1 million provided that it also assumed $690,000 in ASDC debts and made a commitment to invest $38 million in improvements to the hotel and related facilities. The agreement was entered into by A.S.G., and the sale of the hotel was later endorsed by the Board of Directors of the Development Bank, whose members are appointed by the Governor with the advice and consent of the Senate.

In July 28 of 1986 eleven persons brought a shareholders' derivative action seeking an injunction against the sale of the shares, as well as other relief including a declaratory judgment that A.S.G. owns no shares in ASDC. Two of the shareholders were dismissed from the action on the ground that they had purchased their shares after most of the events of which they complained had already happened (apparently with the principal purpose of participating in the lawsuit) and therefore had no standing to claim that they had been damaged by these events. The parties then agreed that the suit be dismissed without prejudice, and the remaining nine plaintiffs brought this action. In addition to A.S.G., the Development Bank, the members of the Board of Directors of ASDC, and various government officials, the new action named Aiga Tasi, Inc., and Li'a Afuvai, an Aiga Tasi employee who had been serving without pay as general manager of the hotel, as defendants.

The lawsuit became even more complicated when on October 15, .1986, in the midst of extensive discovery and about a month before the scheduled trial date, the option contract expired without Aiga Tasi having purchased the shares. Plaintiffs then amended their complaint, shifting its primary focus from an attempt to enjoin the sale to requests for declaratory relief concerning the ownership of the shares and damages for alleged mismanagement of the hotel during the period surrounding the option contract and the employment of Li'a Afuvai. Various cross-claims and counterclaims ensued. The most noteworthy of these were claims by Aiga Tasi that A.S.G. had breached the option contract by refusing to consummate the sale of the shares and that the plaintiffs had tortiously interfered with the option contract. All claims involving Aiga Tasi were then severed

141

from the action, and the remainder of the claims finally went to trial on December 9, 1986.

The presentation of the plaintiffs' case took two days, at the conclusion of which all defendants moved to dismiss the action. The Court granted the motion to dismiss, except with regard to certain claims involving an ultra vires personal loan made by ASDC and the forgiveness of debts alleged to be owed ASDC by ASG, an ASG official, and Aiga Tasi. The defendants involved in these transactions then agreed to the entry of a consent judgment against them on these claims. The parties have requested this written opinion.

Although the plaintiffs' amended complaint is a voluminous document alleging many improprieties over the years, the claims on which relief might conceivably have been granted and on which plaintiffs attempted to present some evidence can be summed up as follows:

(1) The plaintiffs claimed that the Development Bank owned no shares in ASDC, and that the four certificates representing 87,769 shares in the name of the Development Bank had been "illegally and/or improperly issued." (At trial the plaintiffs acknowledged that two of the certificates represented shares that were genuinely owned by the Development Bank, but contested the 60,072 shares evidenced by the other two certificates.)

(2) The plaintiffs claimed that the By-Laws of ASDC had not been lawfully enacted, thus calling into question the legality of many corporate acts including the election of the current Board of Directors.

(3) The plaintiffs asserted improprieties in the election at which most of the current Directors were elected.

(4) The plaintiffs asserted that the current directors had been "appointed" by the Governor rather than elected by the shareholders as provided by law and by the ASDC Articles of Incorporation.

(5) The plaintiffs claimed that the Option Agreement with Aiga Tasi was part of a deliberate attempt to sell the hotel for far less than it was worth to an enterprise composed of close associates and supporters of territorial government officials;

142

that the Option Agreement violated certain provisions of the ASDC Articles of Incorporation; and that ASDC had suffered a consequent diminution in value.

(6) Finally, plaintiffs alleged various acts of corporate mismanagement including the unjustified forgiveness of debts to ASDC, a personal loan made by ASDC in violation of its Articles of Incorporation, excessive compensation of directors, and access by defendant Afuvai to corporate records during his employment by Aiga Tasi.

Defendants introduced other legal issues into the case by way of affirmative defenses. Motions for partial summary judgment and to strike parties were filed a few days before trial urging that plaintiffs were barred by the statute of limitations, estoppel, and laches from denying that the Development Bank owned the ASDC stock; that the individual defendants were not liable in their personal capacities because they had acted in good faith and within the discretionary duties of their offices; and that A.S.G. cannot be sued at all (except in tort in accordance with the provisions of the Government Tort Liability Act, A.S.C.A. § 43.1201 et seq.) because of the doctrine of sovereign immunity.

The statute of limitations, estoppel, laches, and good-faith immunity questions all depended on evidence that was not submitted to the Court prior to the trial, and were therefore deferred until the trial. Our decision on this motion makes it unnecessary to reach those questions. The broader claim by A.S.G. of absolute immunity from any non-tort suits amounts in this case to the assertion that the government created a bank, made loans, took mortgages, acquired stock in a corporation whose other shareholders were private persons, substantially assumed the management of the corporation with its attendant fiduciary duties to those persons, voted on behalf of the bank in corporate elections, and undertook to sell the bank's majority interest in the corporation, all without any implicit agreement to be held responsible for any breach it might commit of the obligations thus undertaken. Although any holding by this Court on the contours of sovereign immunity in the Territory should issue only after plenary briefing and argument in a case in which the issue is crucial, and our decision on the merits on this motion to dismiss makes sovereign immunity

143

irrelevant except as regards the relatively minor instances of mismanagement on which the plaintiffs presented a prima facie case, we hold for the purposes of this motion that the doctrine does not apply.

The crucial issue in this case is whether the Development Bank owns the shares it claims in ASDC. Although the transactions by which the stock was acquired happened only a decade or two ago, prior to the trial neither the Court nor any of the parties had a complete picture of how they occurred. Governor A.P. Lutali, who was one of the original Trustees of ASDC and who was called as a witness by the plaintiffs, testified that the formation of ASDC was the first experience American Samoans had ever had with forming and running a corporation, so that not all of the transactions were handled or documented precisely as would have been done in New York or Washington. As the minutes of some of the corporate meetings introduced into evidence reflect, there seems long to have been an undercurrent of resentment among some shareholders who never understood quite how the bank got its stock and suspected that somebody was pulling a fast one. The situation has been complicated further by a series of fires that destroyed many A.S.G. and Development Bank documents, and by the fact that some of the transactions were handled primarily by former officials of the corporation, the bank, or the government who have left Samoa and are not available as witnesses. Nevertheless, the testimony of Governor Lutali and the exhibits introduced during his testimony do afford a coherent and credible account of how the Development Bank acquired its stock.

The idea behind ASDC was to ensure that development in American Samoa would benefit American Samoans. Stock in the new corporation was therefore sold at $10 per share primarily to A.S.G. employees who paid for it by voluntary payroll deductions. About 1300 people purchased a total of between 20,000 and 30,000 shares.[1] The sum thus

_____

[1] There is conflicting evidence on the number of privately held shares outstanding. According to the testimony of the secretary of ASDC, the 87,796 shares owned by the Development Bank may be closer to 70% of the shares than to the 80% that has been widely assumed. It is not necessary to resolve this question in this case.

raised, however, was not nearly enough to pay for the construction of a hotel. The corporation therefore borrowed $500,000 from the Bank of American Samoa, the predecessor institution of the Development Bank. Subsequently the corporation desired to borrow more money, primarily from federal government agencies which insisted that the obligation to the Bank be discharged before they would lend money to ASDC. On April 16, 1969, therefore, the ASDC Board of Directors voted to authorize the delivery to the Bank of 52,496 shares of ASDC stock and to receive in return the notes representing unpaid principal and interest on the $500,000 loan. It was through similar decisions by the ASDC Board of Directors to capitalize corporate debts that the Development Bank acquired its other three certificates. All of these transactions were proved at trial by documentary and testimonial evidence, and all were within the authority granted the Board of Directors by the ASDC Articles of Incorporation and by applicable statutes.

The plaintiffs put forward two pieces of evidence that might have tended to cast doubt on the validity of two of the stock certificates. First, they attempted to introduce a record of the release of a mortgage securing the $500,000 loan to ASDC. Since the mortgage was released in 1969 and the 52,496 share certificate to the Bank was not issued until 1971, plaintiffs argue that the loan must have been paid off in 1969 and left on the books of the Bank as unpaid until 1971 because of a bookkeeping error. The record of the mortgage release was excluded from evidence because plaintiffs' counsel had omitted it from a list of trial exhibits required before trial as a result of a discovery request and subsequent court order. If it had been introduced, however, it would not have helped the plaintiffs' case. In the first place, a mortgage can be released for some other reason than the payment of the underlying debt. More importantly, the minutes of the April 16, 1969 meeting show precisely how the debt was to be paid: by the issuance of the stock certificate. That the certificate was not physically produced until 1971 (perhaps as a replacement for an earlier certificate in the name of the predecessor institution, or perhaps for some other unknown reason) does not contradict the clear documentary evidence of the 1969 transaction.

Similarly, the plaintiffs' argument that the minutes of a later meeting reflect a motion to capitalize $76,030 in debt by issuing the

145

Development Bank 7,603 shares, but not that the motion was ever voted on, would have been unavailing even if the minutes had been admitted into evidence. The certificate for 7,603 shares is prima facie evidence of its own validity; that it was issued and that there is no record of the debt having been paid in any other way strongly suggest that the omission of the words "motion passed" was a clerical oversight.

The overwhelming preponderance of the evidence at the close of plaintiffs' case also favored the defendants on the other issues:

---There was documentary and testimonial evidence that the By-Laws had been promulgated by the original incorporators soon after the formation of ASDC, and no evidence at all that they had not.

---With regard to the "appointment" of Directors by the Governor, it is clear from the evidence that what the Governor did was to instruct his assistant to cast the 87,796 votes held by the Development Bank in favor of certain candidates at the shareholders' meeting. This is in accordance with the ASDC By-Laws, which explicitly allow the Governor or his proxy to cast the votes of any agency of ASG. The plaintiffs admitted that the Development Bank was an agency of A.S.G. for the purpose of construing this provision of the By-Laws. The Directors of ASDC were elected by the shareholders; the candidates backed by the majority shareholder won the election.

---No evidence was presented tending to cast doubt on the fairness of the bidding process for the Option Agreement. The offer for bids was extensively publicized. The sale price of $1,690,000 was substantially higher than the book value of the ASDC shares, which was $877,960. Moreover, it is not even clear that the shares would have brought their book value on the open market, since there was testimony from all sides on the poor financial performance and physical condition of the hotel. Plaintiffs did submit evidence that the hotel was insured for $11.5 million dollars, but this does not contradict the proposition that the value of ASDC's assets might be far less. A fire insurance policy should be for the amount it would cost to rebuild a building. Whoever buys the hotel will have to do a lot of rebuilding _after_ paying the purchase price in order to get it into serviceable condition. In the absence of any evidence casting doubt on the

146

fairness of the bidding process, the best evidence of the value of the shares is what they actually brought on the market. In any case, since the Development Bank does own the shares it is not at all clear that any other shareholder has a legal right to complain about the price the bank chooses to take for them. No evidence was submitted tending to prove any diminution in value of the minority shareholders' stock as a result of the Option Agreement and surrounding events. Although the sale of the shares to Aiga Tasi would have violated certain provisions of the ASDC Articles of Incorporation and By-Laws, it is clear that the parties to the agreement understood that amendments to these provisions would be necessary prior to the sale. The Articles and By-Laws both provide for their own amendment by the Board of Directors of ASDC, so nothing in ASG's agreement to sell its shares in anticipation of such amendments violated any law or any right of minority shareholders.

---Some of the allegations of corporate mismanagement amount to policy decisions with which it is not a court's business to interfere. The payment to Directors of $200 per meeting and a free weekend at the hotel once a month is an example of such a decision. Similarly, letting Li'a Afuvai work for the hotel without salary, and letting him look at the books of the corporation after his employer Aiga Tasi had already bought an option to buy the majority of the shares, are not decisions with which we would interfere even if we personally believed them to be bad decisions.

---Three of the incidents about which plaintiffs presented evidence, however, are precisely the sorts of matters on which majority shareholders who control a corporation do have responsibilities to minority shareholders. The forgiveness of a debt to A.S.G., which owned 80% of the shares in the corporation, or to a high A.S.G. official, or to Aiga Tasi at a time when Aiga Tasi seemed about to become majority shareholder, can be seen as a way of paying dividends to the majority but not to the minority. Although the personal loan given by ASDC to a hotel employee did not contain this element of self-dealing, it was forbidden by the Articles of Incorporation.

The only defendants connected in any way with these transactions were A.S.G., Governor Lutali in his official capacity, the ASDC directors in their official capacities, and the President of ASDC (who personally authorized all three transactions) in

147

his official and personal capacities. All claims against all other defendants were dismissed except claims by or against Aiga Tasi, which will be considered at a future hearing. All claims against A.S.G., Lutali, Samia, and the ASDC Directors are dismissed except those connected with the three debt transactions. With regard to these three claims the remaining defendants were given their choice of presenting evidence and argument that the transactions were justified or consenting to declaratory and injunctive relief against these and similar transactions. The defendants chose to agree to the proposed consent judgment.